**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

CAMELBAK PRODUCTS, LLC,

      Plaintiff,                               Civil Action No.: 1:20-cv-01544

v.

THE PARTNERSHIPS AND UNINCORPORATED
ASSOCIATIONS IDENTIFIED ON SCHEDULE "A",

      Defendants.

**COMPLAINT**

Plaintiff, Camelbak Products, LLC ("CAMELBAK" or "Plaintiff") hereby files this Complaint against the Partnerships and Unincorporated Associations identified on Schedule A attached hereto (collectively, "Defendants"), and for its Complaint hereby alleges as follows:

**JURISDICTION AND VENUE**

1.     This Court has original subject matter jurisdiction over the claims in this action pursuant to the provisions of the Lanham Act, 15 U.S.C. § 1051 et seq. 28 U.S.C. § 1338(a)–(b) and 28 U.S.C. § 1331. This Court has jurisdiction over the claims in this action that arise under the laws of the State of Illinois pursuant to 28 U.S.C. § 1367(a), because the state law claims are so related to the federal claims that they form part of the same case or controversy and derive from a common nucleus of operative facts.

2.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391, and this Court may properly exercise personal jurisdiction over Defendants since each of the Defendants directly targets consumers in the United States, including Illinois, through at least the fully interactive commercial Internet stores operating under the Defendant domain names and/or the online marketplace accounts identified in Schedule A attached hereto (collectively, the "Defendant

Aliases"). Specifically, Defendants are reaching out to do business with Illinois residents by operating one or more commercial, interactive Internet Stores through which Illinois residents can purchase products bearing counterfeit versions of Plaintiff's trademarks. Each of the Defendants has targeted sales from Illinois residents by operating online stores that offer shipping to the United States, including Illinois, accept payment in U.S. dollars and, on information and belief, has sold products bearing counterfeit versions of Plaintiff's federally registered trademarks to residents of Illinois. Each of the Defendants is committing tortious acts in Illinois, is engaging in interstate commerce, and has wrongfully caused Plaintiff substantial injury in the State of Illinois.

**INTRODUCTION**

3.     This action has been filed by Plaintiff to combat online counterfeiters who trade upon Plaintiff's reputation and goodwill by selling and/or offering for sale products in connection with Plaintiff's CAMELBAK trademarks, which are covered by U.S. Trademark Registration Nos. 1,576,430; 2,098,505; 3,184,821; 4,135,697; and 4,656,766. The registrations are valid, subsisting, unrevoked, uncancelled, and incontestable pursuant to 15 U.S.C. § 1065. The registrations for the trademarks constitute prima facie evidence of validity and of Plaintiff's exclusive right to use the trademarks pursuant to 15 U.S.C. § 1057(b). Genuine and authentic copies of the U.S. federal trademarks registration certificates for the CAMELBAK trademarks are attached as Exhibit 1.

4.     In 1989, bicycle enthusiast Michael Eidson, is competing in the "Hotter'N Hell 100." And that's exactly what it is: a 100-mile road race in the grueling summer heat of Wichita Falls, Texas. Water is vital to surviving the race, and there are few places to refill a water bottle. Eidson, an emergency medical technician by trade, decides to fill an IV bag with water and slip it into a white tube sock. Yes, a tube sock. Then he stuffs the contraption into the back of his bike jersey, throws the thin hose over his shoulder and clamps it with a clothespin.

5.      In 1993, Jeff Wemmer, a competitive cyclist, was hired to visit bike shops from Florida to California, promoting CAMELBAK products from the back of his motorcycle. Each order Jeff faxed back to the factory literally breathed another day of life back into the company.

6.      Thirty years later, CAMELBAK is the recognized inventor of the hands-free hydration category and is the global leader in personal hydration gear. The company employs hundreds of employees and its product may be found in traditional brick-and-mortar retailers such as REI, Target, Dick's Sporting Goods, and Cabela's. CAMELBAK also has a growing online presence that includes many of its brick-and-mortar retailers, such as REI, Target and Dick's Sporting Goods as well as e-commerce giant Amazon. Online sales represent about 25% of total product sales. In the past, CAMELBAK was able to police its marks against identifiable infringers and counterfeiters. The rise of online retailing, coupled with the ability of e-commerce sites to hide their identities, has made it nearly impossible for policing actions to be undertaken. The company has availed itself of takedown procedures to remove infringing products, but these efforts have proved to be an unavailing game of whack-a-mole against the mass counterfeiting that is occurring over the Internet. The aggregated effect of the mass counterfeiting that is taking place has overwhelmed Plaintiff and its ability to police its rights against the hundreds of anonymous defendants which are selling illegal counterfeits at prices substantially below an original:

ORIGINAL



COUNTERFEIT



7.     The above example evidences a cooperative counterfeiting network using fake eCommerce store fronts designed to appear to be selling authorized products. To be able to offer the counterfeit products at a price substantially below the cost of original, while still being able to turn a profit after absorbing the cost of manufacturing, advertising and shipping requires an economy of scale only achievable through a cooperative effort throughout the supply chain. As Homeland Security's recent report confirms, counterfeiters act in concert through coordinated supply chains and distribution networks to unfairly compete with legitimate brand owners while generating huge profits for the illegal counterfeiting network:

> Historically, many counterfeits were distributed through swap meets and individual sellers located on street corners. **Today, counterfeits are being trafficked through vast e-commerce supply chains in concert with marketing, sales, and distribution networks.** The ability of e-commerce platforms to aggregate information and reduce transportation and search costs for consumers provides a big advantage over brick-and-mortar retailers. Because of this, sellers on digital platforms have consumer visibility well beyond the seller's natural geographical sales area.
>
> . . .
>
> The impact of counterfeit and pirated goods is broader than just unfair competition. Law enforcement officials have uncovered intricate links between the sale of counterfeit goods and transnational organized crime. **A study by the Better Business Bureau notes that the financial operations supporting counterfeit goods typically require central coordination**, making these activities attractive for organized crime, with groups such as the Mafia and the Japanese Yakuza heavily involved. Criminal organizations use coerced and child labor to manufacture and sell counterfeit goods. In some cases, the proceeds from counterfeit sales may be supporting terrorism and dictatorships throughout the world.
>
> . . .
>
> Selling counterfeit and pirated goods through e-commerce is a highly profitable activity: production costs are low, millions of potential customers are available online, transactions are convenient, and listing on well-branded e-commerce platforms provides an air of legitimacy.

*See* Department of Homeland Security, *Combating Trafficking in Counterfeit and Pirated Goods*, Jan. 24, 2020, (https://www.dhs.gov/publication/combating-trafficking-counterfeit-and-pirated-goods), at 10, 19 (emphasis added) attached hereto as **Exhibit 2**.

8.     The Defendant Aliases share unique identifiers, such as design elements and similarities of the unauthorized products offered for sale, establishing a logical relationship between them and suggesting that Defendants' illegal operations arise out of the same transaction, occurrence, or series of transactions or occurrences. Defendants use aliases to avoid liability by going to great lengths to conceal both their identities as well as the full scope and interworking of their illegal network. Despite deterrents such as takedowns and other measures, the use of aliases enables counterfeiters to stymie authorities:

> The scale of counterfeit activity online is evidenced as well by the significant efforts e-commerce platforms themselves have had to undertake. A major e-commerce platform reports that its proactive efforts prevented over 1 million suspected bad actors from publishing a single product for sale through its platform and blocked over 3 billion suspected counterfeit listings from being published to their marketplace. Despite efforts such as these, private sector actions have not been sufficient to prevent the importation and sale of a wide variety and large volume of counterfeit and pirated goods to the American public.
>                                  . . .
> A counterfeiter seeking to distribute fake products will typically set up one or more accounts on online third-party marketplaces. The ability to rapidly proliferate third-party online marketplaces greatly complicates enforcement efforts, especially for intellectual property rights holders. Rapid proliferation also allows counterfeiters to hop from one profile to the next even if the original site is taken down or blocked. On these sites, online counterfeiters can misrepresent products by posting pictures of authentic goods while simultaneously selling and shipping counterfeit versions.
>                                  . . .
> Not only can counterfeiters set up their virtual storefronts quickly and easily, but they can also set up new virtual storefronts when their existing storefronts are shut down by either law enforcement or through voluntary initiatives set up by other stakeholders such as market platforms, advertisers, or payment processors.

*Id.* at 5, 11, 12.

9.     eCommerce giant Alibaba has also made public its efforts to control counterfeiting on its platform.  It formed a special task force that worked in conjunction with Chinese authorities for a boots-on the ground effort in China to stamp out counterfeiters. In describing the counterfeiting networks it uncovered, Alibaba expressed its frustration in dealing with "vendors, affiliated dealers

and factories" that rely upon fictitious identities that enable counterfeiting rings to play whack-a-mole with authorities:

# Fighting China's counterfeits in the online era

Xinhua | Updated: 2017-09-19 14:20



BEIJING - A secret team in Chinese e-commerce giant Alibaba has the task of pretending to be online consumers who test-buy purchases from the billion-plus products on its platforms.

Alibaba's Anti-Counterfeiting Special Task Force, formed last year, actively works with local law enforcement agencies, said Qin Seng.

"After we clean up online shops selling counterfeits, the counterfeiters usually change their identities and places of dispatch, using more covert means to continue selling online," Qin said.

The team uses big data to identify counterfeits and the vendors, affiliated dealers and factories suspected of producing or selling counterfeit items. They pass evidence to the public security, administration of commerce and industry, quality inspection, food and drug supervision and other law enforcement agencies. At the same time, they investigate the evidence in the field.

The team faces many risks in their offline probes.

"Most counterfeiting dens are hidden and well-organized. For example, we encountered a village producing counterfeits. The villagers installed cameras everywhere and when they saw outsiders entering, they became vigilant and even threatened us," Qin said.

www.chinadaily.com.cn/business/2017-09/19/content_32200290.htm

See Xinhua, *Fighting China's Counterfeits in the Online Era,* China Daily (Sept. 19, 2017), available at www.chinadaily.com.cn/business/2017-09/19/content_32200290.htm  (**Exhibit 3**)

10.     Plaintiff has been and continues to be irreparably damaged through consumer confusion, dilution, loss of control over its reputation and good-will as well as the quality of goods bearing the CAMELBAK trademarks. The rise of eCommerce as a method of supplying goods to

the public exposes brand holders and creators that make significant investments in their products

to significant harm from counterfeiters:

> Counterfeiting is no longer confined to street-corners and flea markets. The problem has intensified to staggering levels, as shown by a recent Organisation for Economic Cooperation and Development (OECD) report, which details a 154 percent increase in counterfeits traded internationally — from $200 billion in 2005 to $509 billion in 2016. Similar information collected by the U.S. Department of Homeland Security (DHS) between 2000 and 2018 shows that seizures of infringing goods at U.S. borders have increased 10-fold, from 3,244 seizures per year to 33,810.
>
> …
>
> The rise in consumer use of third-party marketplaces significantly increases the risks and uncertainty for U.S. producers when creating new products. It is no longer enough for a small business to develop a product with significant local consumer demand and then use that revenue to grow the business regionally, nationally, and internationally with the brand protection efforts expanding in step. Instead, with the international scope of e-commerce platforms, once a small business exposes itself to the benefits of placing products online — which creates a geographic scope far greater than its more limited brand protection efforts can handle — it begins to face increased foreign infringement threat.
>
> . . .
>
> Moreover, as costs to enter the online market have come down, such market entry is happening earlier and earlier in the product cycle, further enhancing risk. If a new product is a success, counterfeiters will attempt, often immediately, to outcompete the original seller with lower-cost counterfeit and pirated versions while avoiding the initial investment into research and design.
>
> . . .
>
> Counterfeiters have taken full advantage of the aura of authenticity and trust that online platforms provide. While e-commerce has supported the launch of thousands of legitimate businesses, their models have also enabled counterfeiters to easily establish attractive "store-fronts" to compete with legitimate businesses.
>
> *See Combating Trafficking in Counterfeit and Pirated Goods*, Jan. 24, 2020,

(**Exhibit 2)** at 4, 8, 11.

11.　　Not only are the creators and brand holders harmed, the public is harmed as well:

> The rapid growth of e-commerce has revolutionized the way goods are bought and sold, allowing for counterfeit and pirated goods to flood our borders and penetrate

> our communities and homes. Illicit goods trafficked to American consumers by e-commerce platforms and online third-party marketplaces threaten public health and safety, as well as national security. This illicit activity impacts American innovation and erodes the competitiveness of U.S. manufacturers and workers.
>
> The President's historic memorandum provides a much warranted and long overdue call to action in the U.S. Government's fight against a massive form of illicit trade that is inflicting significant harm on American consumers and businesses. <u>This illicit trade must be stopped in its tracks</u>.

*Id.* at 3, 4. (Underlining in original).

12.    Plaintiff's investigation shows that the telltale signs of an illegal counterfeiting ring are present in the instant action. For example, Schedule A shows the use of store names by the Defendant Aliases that employ no normal business nomenclature and, instead, have the appearance of being made up, or if a company that appears to be legitimate is used, online research shows that there is no known address for the company. Thus, the Defendant Aliases are using fake online storefronts designed to appear to be selling genuine Plaintiff products, while selling inferior imitations of Plaintiff's products. The Defendant Aliases also share unique identifiers, such as design elements and similarities of the counterfeit products offered for sale, establishing a logical relationship between them and suggesting that Defendants' illegal operations arise out of the same transaction, occurrence, or series of transactions or occurrences. Defendants attempt to avoid liability by going to great lengths to conceal both their identities and the full scope and interworking of their illegal counterfeiting operation. Plaintiff is forced to file this action to combat Defendants' counterfeiting of Plaintiff's registered trademarks, as well as to protect unknowing consumers from purchasing unauthorized CAMELBAK products over the Internet.

13.    This Court has personal jurisdiction over each Defendant, in that each Defendant conducts significant business in Illinois and in this Judicial District, and the acts and events giving rise to this lawsuit of which each Defendant stands accused were undertaken in Illinois and in this

Judicial District. In addition, each defendant has offered to sell and ship infringing products into this Judicial District.

## THE PLAINTIFF

14. Plaintiff, Camelbak Products, LLC, is a limited liability company that maintains its principal place of business at 2000 South McDowell, Suite 200, Petaluma California 94954. Plaintiff is engaged in the business of manufacturing, distributing and retailing high-quality personal hydration systems such as the CAMELBAK line of portable backpacks comprising a pack, a reservoir, and a mouthpiece connected to the reservoir by a tube that allows users to drink water without the need to use their hands, including within the Northern District of Illinois District (collectively, the "Plaintiff Products") under the federally registered CAMELBAK trademarks. Defendants' sales of Counterfeit Products in violation of Plaintiff's intellectual property rights are irreparably damaging Plaintiff.

15. Plaintiff's brand, symbolized by the CAMELBAK trademarks, is a recognized symbol of high-quality personal hydration products. The CAMELBAK trademarks are distinctive and identify the merchandise as goods from Plaintiff. The registrations for the CAMELBAK trademarks constitute prima facie evidence of their validity and of Plaintiff's exclusive right to use the CAMELBAK trademarks pursuant to 15 U.S.C. § 1057 (b).

16. The CAMELBAK trademarks are distinctive and identify the merchandise as goods from Plaintiff. The registrations for the trademarks constitute prima facie evidence of validity and of Plaintiff's exclusive right to use the trademarks pursuant to 15 U.S.C. § 1057(b). The CAMELBAK trademarks have been continuously used and never abandoned.

17. Plaintiff has expended substantial time, money, and other resources in developing, advertising, and otherwise promoting the CAMELBAK trademarks. More importantly, because

Plaintiff's products are utilized for drinking water, Plaintiff maintains strict quality control standards for all products featuring the Plaintiff's CAMELBAK marks. Plaintiff's authentic CAMELBAK products feature a unique design, instantly recognizable to consumers. Plaintiff has invested significant resources to market and promote the CAMELBAK products around the world. As a result, products bearing the CAMELBAK trademarks are widely recognized and exclusively associated by consumers, the public, and the trade as being products sourced from Plaintiff.

## THE DEFENDANTS

18. Defendants are individuals and business entities who, upon information and belief, reside in the People's Republic of China or other foreign jurisdictions. Defendants conduct business throughout the United States, including within Illinois and in this Judicial District, through the operation of the fully interactive commercial websites and online marketplaces operating under the Defendant Aliases. Each Defendant targets the United States, including Illinois, and has offered to sell and, on information and belief, has sold and continues to sell counterfeit CAMELBAK products to consumers within the United States, including Illinois and in this Judicial District.

## THE DEFENDANTS' UNLAWFUL CONDUCT

19. The success of the CAMELBAK brand has resulted in its counterfeiting. Defendants conduct their illegal operations through fully interactive commercial websites hosted on various e-commerce sites, such as, but not limited to WISH ("Infringing Websites" or "Infringing Webstores"). Each Defendant targets consumers in the United States, including the State of Illinois, and has offered to sell and, on information and belief, has sold and continues to sell counterfeit products that violate Plaintiff's intellectual property rights ("Counterfeit Products") to consumers within the United States, including the State of Illinois.

20.     The Defendant Aliases intentionally conceal their identities and the full scope of their counterfeiting operations in an effort to deter Plaintiff from learning Defendants' true identities and the exact interworking of Defendants' illegal counterfeiting operations. Through their operation of the Infringing Webstores, Defendants are directly and personally contributing to, inducing and engaging in the sale of Counterfeit Products as alleged, often times as partners, co-conspirators and/or suppliers. Upon information and belief, Defendants are an interrelated group of counterfeiters working in active concert to knowingly and willfully manufacture, import, distribute, offer for sale, and sell Counterfeit Products.

21.     Upon information and belief, at all times relevant hereto, the Defendants in this action have had full knowledge of Plaintiff's ownership of the CAMELBAK trademarks, including its exclusive right to use and license such intellectual property and the goodwill associated therewith.

22.     Defendants often go to great lengths to conceal their identities by often using multiple fictitious names and addresses to register and operate their massive network of Defendant Aliases. Other Defendant domain names often use privacy services that conceal the owners' identity and contact information. Upon information and belief, Defendants regularly create new websites and online marketplace accounts on various platforms using the identities listed in Schedule A to the Complaint, as well as other unknown fictitious names and addresses. Such Defendant Internet Store registration patterns are one of many common tactics used by the Defendants to conceal their identities, the full scope and interworking of their massive counterfeiting operation, and to avoid being shut down.

23.     The counterfeit CAMELBAK products for sale in the Defendant Aliases bear similarities and indicia of being related to one another, suggesting that the counterfeit CAMELBAK

products were manufactured by and come from a common source and that, upon information and belief, Defendants are interrelated. The Defendant Aliases also include other notable common features, including use of the same domain name registration patterns, unique shopping cart platforms, accepted payment methods, check-out methods, meta data, illegitimate SEO tactics, HTML user-defined variables, domain redirection, lack of contact information, identically or similarly priced items and volume sales discounts, similar hosting services, similar name servers, and the use of the same text and images.

24.     In addition to operating under multiple fictitious names, Defendants in this case and defendants in other similar cases against online counterfeiters use a variety of other common tactics to evade enforcement efforts. For example, counterfeiters like Defendants will often register new domain names or online marketplace accounts under new aliases once they receive notice of a lawsuit. Counterfeiters also often move website hosting to rogue servers located outside the United States once notice of a lawsuit is received. Rogue servers are notorious for ignoring takedown demands sent by brand owners. Counterfeiters also typically ship products in small quantities via international mail to minimize detection by U.S. Customs and Border Protection. A 2012 U.S. Customs and Border Protection report on seizure statistics indicated that the Internet has fueled "explosive growth" in the number of small packages of counterfeit goods shipped through the mail and express carriers.

25.     Further, counterfeiters such as Defendants, typically operate multiple credit card merchant accounts and third-party accounts, such as ContextLogic, Inc. ("WISH") accounts, behind layers of payment gateways so that they can continue operation in spite of Plaintiff's enforcement efforts. Upon information and belief, Defendants maintain off-shore bank accounts and regularly move funds from their WISH accounts to off-shore bank accounts outside the jurisdiction of this

Court. Indeed, analysis of PayPal transaction logs from previous similar cases indicates that offshore counterfeiters regularly move funds from U.S.-based WISH accounts to China-based bank accounts outside the jurisdiction of this Court.

26.     Upon information and belief, Defendants also deceive unknowing consumers by using the CAMELBAK trademarks without authorization within the content, text, and/or meta tags of their websites to attract various search engines crawling the Internet looking for websites relevant to consumer searches for CAMELBAK products. Additionally, upon information and belief, Defendants use other unauthorized search engine optimization (SEO) tactics and social media spamming so that the Defendant Aliases listings show up at or near the top of relevant search results and misdirect consumers searching for genuine CAMELBAK products. Further, Defendants utilize similar illegitimate SEO tactics to propel new domain names to the top of search results after others are shut down.

27.     Defendants' use of the trademarks on or in connection with the advertising, marketing, distribution, offering for sale and sale of the Counterfeit Products is likely to cause and has caused confusion, mistake and deception by and among consumers and is irreparably harming Plaintiff. Defendants have manufactured, imported, distributed, offered for sale and sold Counterfeit Products using the CAMELBAK trademarks and continue to do so.

28.     Defendants, without authorization or license from Plaintiff, knowingly and willfully used and continue to use the CAMELBAK trademarks in connection with the advertisement, offer for sale and sale of the Counterfeit Products, through, inter alia, the Internet. The Counterfeit Products are not genuine CAMELBAK Plaintiff Products. The Plaintiff did not manufacture, inspect or package the Counterfeit Products and did not approve the Counterfeit Products for sale or distribution. The Defendant Aliases offer shipping to the United States,

including Illinois, and, on information and belief, each Defendant has sold Counterfeit Products into the United States, including Illinois.

29.     Defendants also deceive unknowing consumers by using the CAMELBAK trademarks without authorization within the content, text, and/or meta tags of the listings on Infringing Webstores in order to attract various search engines crawling the Internet looking for websites relevant to consumer searches for CAMELBAK Products and in consumer product searches within the Webstores.

30.     Upon information and belief, Defendants will continue to register or acquire listings for the purpose of selling Counterfeit Goods that infringe upon the CAMELBAK trademarks unless preliminarily and permanently enjoined.

31.     Defendants' use of the CAMELBAK trademarks in connection with the advertising, distribution, offering for sale, and sale of counterfeit CAMELBAK products, including the sale of counterfeit CAMELBAK products into Illinois, is likely to cause and has caused confusion, mistake, and deception by and among consumers and is irreparably harming Plaintiff.

## COUNT I
## TRADEMARK INFRINGEMENT AND COUNTERFEITING (15 U.S.C. § 1114)

32.     Plaintiff repeats and incorporates by reference herein its allegations contained in the above paragraphs of this Complaint.

33.     This is a trademark infringement action against Defendants based on their unauthorized use in commerce of counterfeit imitations of the registered CAMELBAK trademarks in connection with the sale, offering for sale, distribution, and/or advertising of infringing goods.

The CAMELBAK trademarks are highly distinctive. Consumers have come to expect the highest quality from Plaintiff's products provided under the CAMELBAK trademarks.

34.     Defendants have sold, offered to sell, marketed, distributed, and advertised, and are still selling, offering to sell, marketing, distributing, and advertising products in connection with the CAMELBAK trademarks without Plaintiff's permission.

35.     Plaintiff is the exclusive owner of the CAMELBAK trademarks. Plaintiff's United States Registrations for the CAMELBAK trademarks (Exhibit 1) are in full force and effect. Upon information and belief, Defendants have knowledge of Plaintiff's rights in the CAMELBAK trademarks, and are willfully infringing and intentionally using counterfeits of the CAMELBAK trademarks. Defendants' willful, intentional and unauthorized use of the CAMELBAK trademarks are likely to cause and is causing confusion, mistake, and deception as to the origin and quality of the counterfeit goods among the general public.

36.     Defendants' activities constitute willful trademark infringement and counterfeiting under Section 32 of the Lanham Act, 15 U.S.C. § 1114.

37.     Plaintiff has no adequate remedy at law, and if Defendants' actions are not enjoined, Plaintiff will continue to suffer irreparable harm to its reputation and the goodwill of its well-known CAMELBAK trademarks.

38. The injuries and damages sustained by Plaintiff have been directly and proximately caused by Defendants' wrongful reproduction, use, advertisement, promotion, offering to sell, and sale of counterfeit CAMELBAK products.

## COUNT II
## FALSE DESIGNATION OF ORIGIN (15 U.S.C. § 1125(a))

39.     Plaintiff repeats and incorporates by reference herein its allegations contained in the above paragraphs of this Complaint.

40.     Defendants' promotion, marketing, offering for sale, and sale of counterfeit CAMELBAK products has created and is creating a likelihood of confusion, mistake, and deception among the general public as to the affiliation, connection, or association with Plaintiff or the origin, sponsorship, or approval of Defendants' counterfeit CAMELBAK products by Plaintiff.

41.     By using the CAMELBAK trademarks in connection with the sale of counterfeit CAMELBAK products, Defendants create a false designation of origin and a misleading representation of fact as to the origin and sponsorship of the counterfeit CAMELBAK products.

42.     Defendants' false designation of origin and misrepresentation of fact as to the origin and/or sponsorship of the counterfeit CAMELBAK products to the general public is a willful violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125.

43.     Plaintiff has no adequate remedy at law and, if Defendants' actions are not enjoined, Plaintiff will continue to suffer irreparable harm to its reputation and the goodwill of its brand.

### COUNT III
### VIOLATION OF ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES ACT
### (815 ILCS § 510, et seq.)

44.     Plaintiff repeats and incorporates by reference herein its allegations contained in the above paragraphs of this Complaint.

45.     Defendants have engaged in acts violating Illinois law including, but not limited to, passing off their counterfeit CAMELBAK products as those of Plaintiff, causing a likelihood of confusion and/or misunderstanding as to the source of their goods, causing a likelihood of confusion and/or misunderstanding as to an affiliation, connection, or association with genuine CAMELBAK products, representing that their products have Plaintiff's approval when they do

not, and engaging in other conduct which creates a likelihood of confusion or misunderstanding among the public.

46. The foregoing Defendants' acts constitute a willful violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS § 510, et seq.

47. Plaintiff has no adequate remedy at law, and Defendants' conduct has caused Plaintiff to suffer damage to its reputation and goodwill. Unless enjoined by the Court, Plaintiff will suffer future irreparable harm as a direct result of Defendants' unlawful activities.

**COUNT IV**
**CIVIL CONSPIRACY**

48. Plaintiff repleads and incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

49. Plaintiff is informed and believe and thereon allege that Defendants knowingly and voluntarily entered into a scheme and agreement to engage in a combination of unlawful acts and misconduct including, without limitation, engaging in collaborated efforts for the distribution, marketing, advertising, shipping, offering for sale, or sale of fake CAMELBAK Products which are a violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS § 510, et seq.

50. The intent, purpose and objective of the conspiracy and the underlying combination of unlawful acts and misconduct committed by the Defendants was to undermine CAMELBAK and its business by unfairly competing against it as described above.

51. The Defendants each understood and accepted the foregoing scheme and agreed to do their respective part, to further accomplish the foregoing intent, purpose and objective. Thus, by entering into the conspiracy, each Defendant has deliberately, willfully and maliciously permitted, encouraged, and/or induced all of the foregoing unlawful acts and misconduct.

18

52.     As a direct and proximate cause of the unlawful acts and misconduct undertaken by each Defendant in furtherance of the conspiracy, CAMELBAK has sustained, and unless each Defendant is restrained and enjoined, will continue to sustain severe, immediate and irreparable harm, damage and injury for which CAMELBAK has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

1) That Defendants, their affiliates, officers, agents, servants, employees, attorneys, confederates, and all persons acting for, with, by, through, under, or in active concert with them be temporarily preliminarily, and permanently enjoined and restrained from:

a. using the CAMELBAK trademarks or any reproductions, counterfeit copies, or colorable imitations thereof in any manner in connection with the distribution, marketing, advertising, offering for sale, or sale of any product that is not a genuine CAMELBAK product or is not authorized by Plaintiff to be sold in connection with the CAMELBAK trademarks;

b. passing off, inducing, or enabling others to sell or pass off any product as a genuine CAMELBAK product or any other product produced by Plaintiff that is not Plaintiff's or not produced under the authorization, control, or supervision of Plaintiff and approved by Plaintiff for sale under the CAMELBAK trademarks;

c. committing any acts calculated to cause consumers to believe that Defendants' counterfeit CAMELBAK products are those sold under the authorization, control, or supervision of Plaintiff, or are sponsored by, approved by, or otherwise connected with Plaintiff;

d. further infringing the CAMELBAK trademarks and damaging Plaintiff's goodwill;

e.  otherwise competing unfairly with Plaintiff in any manner;

f.  shipping, delivering, holding for sale, transferring or otherwise moving, storing, distributing, returning, or otherwise disposing of, in any manner, products or inventory not manufactured by or for Plaintiff, nor authorized by Plaintiff to be sold or offered for sale, and which bear any Plaintiff trademarks, including the CAMELBAK trademarks, or any reproductions, counterfeit copies, or colorable imitations thereof;

g.  using, linking to, transferring, selling, exercising control over, or otherwise owning the online marketplace accounts, the Defendant domain names, or any other domain name or online marketplace account that is being used to sell or is the means by which Defendants could continue to sell counterfeit CAMELBAK products; and

h.  operating and/or hosting websites at the Defendant domain names and any other domain names registered or operated by Defendants that are involved with the distribution, marketing, advertising, offering for sale, or sale of any product bearing the CAMELBAK trademarks or any reproduction, counterfeit copy or colorable imitation thereof that is not a genuine CAMELBAK product or not authorized by Plaintiff to be sold in connection with the CAMELBAK trademarks; and

2)  That Defendants, within fourteen (14) days after service of judgment with notice of entry thereof upon them, be required to file with the Court and serve upon Plaintiff a written report under oath setting forth in detail the manner and form in which Defendants have complied with paragraph 1, a through h, above;

3)  Entry of an Order that, upon Plaintiff's request, those in privity with Defendants and those with notice of the injunction, including any online marketplaces such as, but not limited to, WISH, social media platforms, Facebook, YouTube, LinkedIn, Twitter, Internet search engines

such as Google, Bing and Yahoo, web hosts for the Defendant domain names, and domain name registrars, shall:

    a. disable and cease providing services for any accounts through which Defendants engage in the sale of counterfeit CAMELBAK products using the CAMELBAK trademarks, including any accounts associated with the Defendants listed on Schedule A;

    b. disable and cease displaying any advertisements used by or associated with Defendants in connection with the sale of counterfeit CAMELBAK products using the CAMELBAK trademarks; and

    c. take all steps necessary to prevent links to the Defendant domain names identified on Schedule A from displaying in search results, including, but not limited to, removing links to the Defendant domain names from any search index; and

5) That Defendants account for and pay to Plaintiff all profits realized by Defendants by reason of Defendants' unlawful acts herein alleged, and that the amount of damages for infringement of the CAMELBAK trademarks be increased by a sum not exceeding three times the amount thereof as provided by 15 U.S.C. § 1117;

6) In the alternative, that Plaintiff be awarded statutory damages pursuant to 15 U.S.C. § 1117(c)(2) of $2,000,000 for each and every use of the CAMELBAK trademarks;

7) That Plaintiff be awarded its reasonable attorneys' fees and costs; and

8) Award any and all other relief that this Court deems just and proper.

DATED:  March 2, 2020                                      Respectfully submitted,

                                                          */s/ Keith A. Vogt*
                                                          Keith A. Vogt (Bar No. 6207971)
                                                          Keith Vogt, Ltd.
                                                          111 West Jackson Boulevard, Suite 1700
                                                          Chicago, Illinois 60604
                                                          Telephone: 312-675-6079
                                                          E-mail:  keith@vogtip.com

                                                          ***ATTORNEY FOR PLAINTIFF***